UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOE (K.H.), AN INDIVIDUAL,

Plaintiff,

v.

R-ROOF VI LLC D/B/A RED ROOF INN, FMW RRI I LLC D/B/A RED ROOF INN, ANN ARBOR HOSPITALITY LLC D/B/A RED ROOF INN, RRI I LLC D/B/A RED ROOF INN, AND RED ROOF INNS, INC.,

Defendants.

Case No. 2:23-cv-11422-TCB-EAS

## FIRST AMENDED COMPLAINT & JURY DEMAND

Jane Doe (K.H.), Plaintiff in the above-styled and numbered cause, files this First Amended Complaint and respectfully shows the Court as follows:

## SUMMARY

1.     K.H. files this civil lawsuit seeking compensation for the harm she suffered because of the continuous sex trafficking she endured at three Red Roof Inn (RRI) branded hotels that were owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person to cause the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, drugs and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

4.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

5.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

6.     As discussed below, each Defendant knowingly benefited from participating in a venture that facilitated sex trafficking at these RRI branded hotels, including the trafficking of K.H.  Defendants provided a venue where traffickers could exploit victims with minimal risk of detection or interruption. Defendants kept supporting traffickers, including K. H's traffickers, despite evident and apparent signs of widespread and ongoing sex trafficking. Accordingly, K.H. brings this suit under the TVPRA.

## PARTIES

7.     Plaintiff K.H. is a resident and citizen of Michigan. She may be contacted through her lead counsel, whose information is below.

8.     K.H. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of being caused, through force fraud or coercion, to commit a commercial sex act.

9.     Defendant R-Roof VI LLC d/b/a Red Roof Inn ("R-Roof VI") is a duly qualified and licensed limited liability company in the State of Michigan. It owned the RRI located at 3219 Miller Rd G Flint, MI ("Miller Rd RRI") until November 3, 2011. It can be served by its registered agent CSC-LAWYERS INCORPORATING SERVICE, 601 Abbot Road, East Lansing, MI 48823.

10.     Defendant FMW RRI I LLC d/b/a Red Roof Inn ("FMW RRI I") is a duly qualified and licensed limited liability company in the State of Michigan. It

owned the RRI located at 3219 Miller Rd G Flint, MI from November 3, 2011, until November 22, 2013. It can be served by its registered agent CSC-LAWYERS INCORPORATING SERVICE, 601 Abbot Road, East Lansing, MI 48823. Upon information and belief, FMW RRI I is an affiliate of the Westmont Hospitality Group.

11.    Defendant Ann Arbor Hospitality LLC d/b/a Red Roof Inn ("Ann Arbor Hospitality") is a duly qualified and licensed limited liability company in the State of Michigan. It owns the RRI located at 3505 S State St, Ann Arbor, MI ("State St. RRI"). It can be served by its registered agent Atif Jarbo, 3505 S State St, Ann Arbor, MI 48108.

12.    Defendant RRI I LLC d/b/a Red Roof Inn ("RRI I") is a duly qualified and licensed limited liability company in the State of Michigan. It owned the RRI Plus located at 3621 Plymouth Rd., Ann Arbor, MI ("Plymouth Rd. RRI"). It can be served by its registered agent The Corporation Company 40600 Ann Arbor Rd E Ste 201, Plymouth, MI, 48170.

13.    The Miller Rd RRI, the State St RRI, and the Plymouth Rd RRI are referred to collectively as "the Subject RRIs."

14.    Defendant Red Roof Inns, Inc. d/b/a Red Roof Inn ("RRI Inc.") is a Delaware corporation with its principal place of business in Ohio. It can be served

by its registered agent CSC-LAWYERS INCORPORATING SERVICE, 3410 Belle Chase Way Ste 600, Lansing, MI 48911.

15. Defendant Red Roof Franchising, LLC d/b/a Red Roof Inn ("RRI Franchising") is a Delaware corporation with its corporate headquarters and principal place of business in Ohio. It can be served by its registered agent CSC-LAWYERS INCORPORATING SERVICE, 3410 Belle Chase Way Ste 600, Lansing, MI 48911. RRI Franchising is a direct subsidiary of RRF Holding Company, LLC, whose parent company is RRI Inc.

16. Defendant RRI West Management, LLC d/b/a Red Roof Inn ("RRI West Management") is a Delaware Limited Liability Company duly qualified in the State of Michigan. It can be served by its registered agent CAPITOL CORPORATE SERVICES, INC, 186 N. Main St. 2nd FL STE 1 Plymouth, MI 48170. RRI West Management shares a common parent company with RRI Inc.: WRRH LP. RRI West Management is an affiliate of RRI Inc. and RRI Franchising.

17. RRI Inc., RRI Franchising, and RRI West Management, are referred to collectively as the "RRI Brand Defendants."

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

19. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

## STATEMENT OF FACTS

I. **K.H. was a victim of unlawful sex trafficking at hotels owned, operated, managed, and controlled by Defendants.**

20. Between at least January 2011 and October 2013, K.H. was a victim of sex trafficking and under the continuous control of her traffickers.

21. These traffickers advertised K.H.'s commercial sex services and used force, manipulation, and coercion to require her to engage in commercial sex services for their financial benefit.

22. K.H.'s traffickers would require her to see up to 10 "johns" in a day.

23. K.H.'s traffickers controlled all proceeds from the commercial sex work they forced her to perform.

24. K.H.'s trafficker moved her and other victims between hotels on a rotating basis and brought her back to the same hotels on a recurring basis. During this time, K.H. was repeatedly trafficked at three RRI properties in Michigan that were owned, operated, managed, and controlled by Defendants.

25. During K.H.'s trafficking period, there were two types of RRI properties: corporate properties owned and operated by corporate affiliates and

franchised properties owned by third-party franchisees and operated in conjunction with RRI affiliates and/or as agents of RRI affiliates. K.H.'s trafficking occurred at both corporate properties and franchised properties.

**A. K.H.'s Trafficking at the Miller Rd. RRI**

26.     Between January 2011 and October 2013, K.H. was repeatedly trafficked for sex at the Miller Rd. RRI.

27.     K.H. was trafficked for sex over 50 times at this hotel.

28.     From January 2011 to November 2, 2011, this hotel was a corporate owned and operated hotel property. It was owned by R-Roof VI, an RRI-affiliated entity controlled by RRI, and operated and managed by the RRI Brand Defendants.

29.     In 2011, RRI Inc. recapitalized the ownership of its hotel assets. Following this recapitalization, from November 3, 2011, to October 2013, the Miller Rd hotel remained a corporate owned and operated facility but under a different configuration.

30.     Between November 3, 2011, and October 2013, the Miller Rd hotel was owned by FMW RRI I, an RRI affiliate and a subsidiary of RRI West Management controlled by RRI West Management. During this period, FMW RRI I had both a franchising agreement and a management agreement with the RRI Brand Defendants. As such, the RRI Brand Defendants participated directly in the operation and management of Miller Rd RRI.

31.     Upon information and belief, the RRI Brand Defendants employed the hotel staff during the entire trafficking period.

32.     Upon information and belief, the RRI Brand Defendants were directly involved in hotel operations during the entire trafficking period and employed regional staff who worked at the Miller Rd. RRI.

33.     K. H.'s sexual exploitation repeatedly occurred in rooms of the Miller Rd. RRI hotel and was facilitated by the individual and collective acts of R-Roof VI, RRI Inc., FMW RRI I, and the RRI Brand Defendants (collectively, the "Miller Rd. Defendants").

**B. K.H.'s Trafficking at the State St RRI**

34.     K.H. was also repeatedly trafficked for sex at the State St. RRI hotel in November and December 2012.

35.     K.H.'s traffickers brought her and several other women to the State St. RRI and rented rooms to be used for in calls.

36.     During this period, the State St. RRI was a franchised location owned by Ann Arbor Hospitality and operated through the RRI franchising system.

37.     Upon information and belief, Ann Arbor Hospitality employed the frontline hotel staff and participated in operations of the State St RRI.

38.   Upon information and belief, RRI Inc. and RRI Franchising were directly involved in and exercised control over day-to-day operation of the State St RRI.

39.   K. H.'s sexual exploitation repeatedly occurred in rooms of the State St. RRI and was facilitated by the individual and collective acts of Ann Arbor Hospitality, RRI Inc., and RRI Franchising (collectively, the "State St. Defendants").

**C. K.H.'s Trafficking at the Plymouth Rd. RRI**

40.   K.H. was also repeatedly trafficked for sex at the Plymouth Rd. RRI hotel between November 2012 and May 2013. K.H.'s trafficker brough her to this hotel on multiple occasions for multi-day periods. Other victims were also trafficked at the Plymouth Rd. RRI at and around the same time K.H. was trafficked there.

41.   During this period, the Plymouth Rd. RRI was a corporate owned and operated facility. It was owned by RRR I, an RRI affiliated entity controlled by RRI. The Plymouth Rd. RRI was operated and managed by the RRI Brand Defendants.

42.   Upon information and belief, RRI Brand Defendants were the employer of the hotel staff at the Plymouth Rd. RRI during this period.

43.   Upon information and belief, RRI West Management was directly involved in hotel operations during the entire trafficking period and employed regional staff who worked at the Plymouth Rd. RRI.

44.    K.H.'s sexual exploitation repeatedly occurred in rooms of the Plymouth Rd. RRI and was facilitated by the individual and collective acts of RRI I, RRI Inc., and the RRI Brand Defendants (collectively, the "Plymouth Rd. Defendants").

II.    **The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem**

45.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of K.H.

46.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[2] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when operating within hotels."[3] In 2014, 92 percent of calls to the Human Trafficking Hotline involved

---

[2] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id

[3] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

reports of sex trafficking taking place at hotels.[4] Hotels have been found to account for over 90 percent of the commercial exploitation of children.[5]

47.     Traffickers use hotels as the hub of their operations. Inside the privacy afforded by hotel walls, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is known as an "in call."

48.     Hotels are also the venue of choice for buyers seeking an "out call," where the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the illegal and sordid transaction

49.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

50.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas

---

[4] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf
[5] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[6]

51.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking.[7] The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

52.    Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[8] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

53.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of that hotel.

---

[6] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[7] *Id.*

[8] Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

54.     There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[9]

55.     The most effective weapon against sexual exploitation and human trafficking is education and training.[10] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From

---

[9]https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf

[10] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[11]

56.    This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[12] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

57.    Public statements made by hotel-industry defendants prior to K.H.'s trafficking confirm that the industry knew of the problem and the industry's role in responding to the problem. Recognizing the unique vantage point that hotel owners and staff often have to identify potential human trafficking ventures and victims on their properties, several major hotel chains, including franchisors, franchisees, and owner/operators, told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking. For example:

    a. By 2006, hotels started signing EPCAT's Code of Conduct for the Protection of Children for Sex Exploitation in Travel and Tourism, commonly known as "the Code." In signing the code on behalf of the

---

[11] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[12] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

Carlson hotel brands, then chairwoman and CEO said she was breaking a "conspiracy of silence" about sex trafficking in the hotel industry.[13]

b. In 2010, Starwood Hotels and Resorts publicly acknowledged that as a hotel chain it was in a "unique position" to help stop the sexual exploitation of children in the travel and tourism industries.[14]

c. In 2011, Wyndham acknowledged that as a hotel franchise it could play a "critical role in increasing awareness and prevention" of human trafficking.[15]

58. Upon information and belief, Defendants had the same knowledge and exposure to the same sources of information as the other industry actors who publicly acknowledged the hotel industry's inextricable relationship with human trafficking.

59. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by supporting and facilitating unlawful sex trafficking, including Defendants herein.

60. Given their knowledge about the prevalence of sex trafficking in the hotel industry, how to detect trafficking in a hotel setting, and how to avoid facilitating this trafficking at their hotel properties, all Defendants had a duty to

---

[13] https://www.travelweekly.com/Travel-News/Travel-Agent-Issues/The-war-on-human-trafficking
[14] https://media.business-humanrights.org/media/documents/files/reports-and-materials/Starwood-response-re-CBIS-trafficking-appeal-15-Jun-2010.pdf
[15] http://www.cnn.com/2011/US/07/29/child.prostitution.hotel/index.html

adopt and enforce anti-trafficking policies for the Subject RRIs and to provide the hotel staff with appropriate training on detecting and responding to "red flags" of sex trafficking. Unfortunately for K.H., each of the Defendants failed to do so. Instead, each Defendant benefited from continuing to provide favorable venues for sex trafficking, including at the Subject RRIs.

### III.   Sex Trafficking Has Long Been Prevalent at RRI Branded Properties, and Defendants Knew or Should Have Known This.

61.    Defendants' actual knowledge about sex trafficking was *not* limited to their general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants knew, well before K.H.'s trafficking, that sex trafficking was ongoing and widespread at RRI branded properties.

62.    News reports establish that RRI branded properties have long been used as a venue for sex trafficking and other criminal activity closely associated with sex trafficking. For example:

> a. In 2010, a man and woman appeared in court on charges of trafficking a 14-year-old Milwaukee girl at a Red Roof Inn in Oak Creek, Wisconsin. At the Red Roof Inn, the traffickers gave the girl marijuana to smoke and then took pictures of her naked, which were put on a local website.[16]

---

[16] John Diedrich, *2 face federal sex-trafficking charges*, Milwaukee Journal Sentinel (June 16, 2010), https://archive.jsonline.com/news/crime/96508359.html/

b. In 2012, a Pennsylvania man was indicted by a federal grand jury on charges of sex trafficking involving a 16-year-old girl who was trafficked at a New Jersey Red Roof Inn in May 2012.[17]

c. In 2012, A Minneapolis police officer investigating juvenile sex trafficking activity spotted an ad on the website Backpage.com that depicted the image of a provocatively dressed young woman offering "unrushed service, full of pleasure." The officer called the number on the ad and spoke with a female who said she was at the Red Roof Inn in Woodbury.[18]

d. In 2013, a 50-year-old man was charged with prostitution and human trafficking, for forcing a woman to perform sex acts against her will at the Red Roof Inn on Eisenhower Boulevard.[19]

e. In 2013, a local news station investigated a Florida Red Roof Inn because of the high volume of search warrants that continued to pop up for the hotel, including multiple warrants that reported a high volume of prostitution activity at the hotel.[20]

f. In 2013, A Lubbock grand jury indicted four suspects arrested during a prostitution sting. Police discovered two underage victims during their sting operation at the Red Roof Inn.[21]

63.   Upon information and belief, each Defendant monitored criminal activity occurring at RRI branded hotels and thus was aware of these incidents and many similar incidents at RRI properties around the country.

---

[17] Press Release, The Federal Bureau of Investigation, Pennsylvania Man Charged with Sex Trafficking of a Minor (June 27, 2012), https://archives.fbi.gov/archives/newark/press-releases/2012/pennsylvania-man-charged-with-sex-trafficking-of-a-minor

[18] Mike Longaecker, Police: Sex trafficking victim turns up at Woodbury hotel, Republican Eagle (August 17, 2012), https://www.republicaneagle.com/news/public_safety/police-sex-trafficking-victim-turns-up-at-woodbury-hotel/article_88eac778-73b4-50cb-ac65-182279d50948.html

[19] Brittany Miller, *Man charged in prostitution ring headed to Dauphin County court*, Penn Live Patriot News(October 9, 2013), https://www.pennlive.com/midstate/2013/10/post_625.html

[20] https://www.abcactionnews.com/news/motel-frequently-involved-in-criminal-activity-sees-more-than-200-calls-for-service-this-year

[21] *4 indicted on prostitution charges after Red Roof Inn sting*, KCBD News 11 (August 28, 2013), https://www.kcbd.com/story/23272377/4-charged-with-prostitution-offenses-after-red-roof-inn-sting/

64. Upon information and belief, upper-level executives of the RRI Brand Defendants monitored news stories and law-enforcement reports regarding criminal activity at RRI branded hotels. Upon information and belief, the public relations department for the RRI Brand Defendants would circulate communications discussing criminal activity, including human trafficking and prostitution, at RRI branded properties.

65. Upon information and belief, the RRI Brand Defendants also carefully monitored online reviews and other customer feedback for RRI branded properties. Indeed, top leadership of the RRI Brand Defendants was "obsessed" with review of customer feedback, including online reviews.[22]

66. Leadership of the RRI Brand Defendants would receive compiled reviews from Reputology, an online-review aggregator that compiled reviews for Red Roof Inns all over the country.[23] RRI Brand Defendants responded to or required other Defendants to respond to reviews posted on review websites.

67. A sampling of online reviews demonstrates that Defendants were on notice of criminal activity associated with sex trafficking and other indicia of sex trafficking at the Subject RRIs and other RRI properties. For example:

---

[22] https://www.usatoday.com/story/travel/hotels/2013/04/05/red-roof-hotel-outlets/2056817/
[23] https://www.e-marketingassociates.com/blog/use-the-new-hootsuite-reputology-app-to-monitor-online-reviews

a. In a Trip Advisor review for the Miller Rd RRI from July 10, 2011, the reviewer wrote, "There were gang members in matching white t-shirts walking around and when they didn't know I was looking, (I was in my car getting my luggage) I saw them walking by room and one of them even fiddled with my door knob. After seeing a gang member mess with my doorknob (and I know gang members when I see them, cuz I'm originally from the ghetto of Flint), & smelling weed super strong all around me, and having a tranny prostitute (on the 2nd floor above my room) holler at me; I decided to ask to be switched to another room… The sheets were filthy & stained and there was change still sitting on the bed (probably a tip to a prostitute)."[10]

b. In a Trip Advisor review from June 24, 2012 for the Miller Rd RRI, the reviewer wrote, "ABSOLUTELY NEVER STAY HERE - drug dealing and prostitution rife at hotel."[11] The general manager of RRI responded to this review on September 4, 2012.

c. In a Trip Advisor review from September 12, 2012, the reviewer wrote, "from the sounds of this he has nothing to say to defend the actions of his motel which is drug infested and has a high amount of ladies of the night and day there."[12] The general manager of RRI responded to this review on September 27, 2012.

d. A 2016 Google review for the State St RRI reads: "Drug activity, prostitutes and mold inside our room. Management informed with the owner present. They are aware of issues and do not care."[13]

e. In a July 2010 review for a Wisconsin RRI, the reviewer reported seeing a woman who was obviously "dressed for business" in commercial sex work. The reviewer reported going to the front desk and asking staff if they knew what was going on. Staff responded they did know but were not going to do

anything about it. The reviewer felt unsafe and decided to leave.[24]

f. An Expedia review from July 6, 2010, for a California RRI stated, "If you want a filthy room this is your place! We stayed only a few hours. We think this place was being used for a weekend drug and prostitution house, way to many people in and out. Lots of noise and yelling."[25]

g. A TripAdvisor review from January 30, 2011, stated of a Virginia RRI, "All night long people were pulling into the spots around my room blasting loud Bass from there cars at 3:00am. There was literally a pimp staying in the room above me who was leaving in his loud truck every 30minutes to pick up and drop off his prostitutes. I am not Kidding!! I generally don't complain but this was unacceptable. The good thing is they fully refunded my money."[26]

h. A TripAdvisor review from August 20, 2012, of an Ontario RRI stated, "This hotel has bed bugs and prostitution working the hotel. The desk clerks are in on it and making a kick back on it. They think it's funny and don't have time to deal with it. It was just a very poor excuse for a hotel. The desk clerk was rude to a lady that was ahead of me."[27]

i. In 2012, a review of an RRI property in Texas warned that guests would be greeted by "HOOKERS in the lobby."[28]

j. A July 2013 review of an RRI in Indiana reported observing "hookers get visited next door."[29]

---

[24] https://www.tripadvisor.com/Hotel_Review-g60859-d100934-Reviews-or60-Red_Roof_Inn_Madison_WI-Madison_Wisconsin.html#REVIEWS

[25] https://www.expedia.com/Stockton-Hotels-Red-Roof-Inn-Stockton.h790032.Hotel-Reviews

[26] https://www.tripadvisor.com/Hotel_Review-g57597-d230318-i147951903-Red_Roof_Inn_Chesapeake_Conference_Center-Chesapeake_Virginia.html

[27]     https://www.tripadvisor.com/Hotel_Review-g32823-d78838-Reviews-or255-Red_Roof_Inn_Ontario_Airport-Ontario_California.html

[28] https://www.tripadvisor.com/ShowUserReviews-g56208-d1462022-r139592305-Red_Roof_Inn_Conference_Center_Lubbock-Lubbock_Texas.html

[29] https://www.tripadvisor.com/ShowUserReviews-g37315-d227756-r166845987-Red_Roof_Inn_Michigan_City-Michigan_City_Indiana.html

68.     In addition, the RRI Brand Defendants also knew or should have known about widespread trafficking at RRI properties based on non-public sources of information available to these Defendants because of their role operating, managing, franchising, and controlling RRI hotels. Upon information and belief, the sources of information available to the RRI Brand Defendants that gave them notice of trafficking activity included but were not limited to:

    a. The RRI Brand Defendants' direct supervision and management of RRI branded properties.

    b. The RRI Brand Defendants' collection and review of surveillance footage from RRI branded properties.

    c. The RRI Brand Defendants' capture, retention, and analysis of extensive data about virtually all aspects of the operation of the RRI branded properties, including extensive guest data and detailed reports about hotel operations through reservation and property management systems.

    d. The RRI Brand Defendants' capture, review, and analysis of customer feedback from surveys and customer hotlines, which was then circulated and distributed among upper-level management through Negative Review reports.

    e. The RRI Brand Defendants' protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity the RRI Brand Defendants.

    f. The RRI Brand Defendants' communication with law enforcement about criminal activity at RRI properties.

    g. The RRI Brand Defendants' regular inspection of the RRI branded properties.

    h. Other sources of non-public information available to the RRI Brand Defendants.

69.     Based on all these sources of information, by the time K.H. was trafficked at their hotel properties, the RRI Brand Defendants knew, at least, that there was widespread and ongoing sex trafficking occurring at their branded properties stemming from their top-level decisions and that they were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

## IV.     Defendants' Knowledge of Sex Trafficking at the Subject RRIs

70.     Defendants also specifically knew or should have known about the widespread sex trafficking at the Subject RRIs, including the activities of K.H.'s traffickers.

71.     Every time K.H. or her traffickers interacted with hotel staff, there were readily apparent signs of trafficking. K.H.'s trafficking, and the *modus operandi* of her traffickers, followed well-established patterns of "red flags" for trafficking activity in a hotel.

72.     These "red flags" were observed by hotel staff at each of the Subject RRIs.

**A. The Miller Rd. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Miller Rd. RRI, including K.H.'s trafficking, but continued providing a venue for trafficking.**

73.     The Miller Rd Defendants knew or should have known that sex trafficking was widespread and ongoing at the Miller Rd RRI.

74.     The Miller Rd Defendants knew that this hotel was in a high-crime area and was a high-risk zone for prostitution and sex trafficking. Even after K.H.'s trafficking, the hotel has continued to be a hub for criminal activity, including trafficking of minors.[30]

75.     The Miller Rd. Defendants knew or should have known the hotel was catering to traffickers and pimps. Upon information and belief, traffickers repeatedly and intentionally chose to use the Miller Rd. RRI for their sex trafficking activity because they knew that members of the staff looked the other way, because the policies and practices of the hotel facilitated their trafficking, and because of the access and security the hotel provided. These traffickers repeatedly interacted with the staff of the Miller Rd. RRI. The signs of this widespread sex trafficking were obvious, and the hotel staff knew about this activity or was willfully blind to it.

76.     Each of RRI Brand Defendants knew or should have known about the widespread and ongoing trafficking at the Miller Rd. RRI because of the methods, described above, that these Defendants used to monitor potential criminal activity at all RRI properties.

77.     When K.H. was trafficked at the Miller Rd RRI, there were obvious signs of her trafficking:

> a. The hotel rooms where she was trafficked were often paid for with prepaid cards.

---

[30] https://midmichigannow.com/news/local/two-charged-in-assault-and-extortion-of-four-14-year-old-girls

b. The hotel rooms where she was trafficked were often booked under a fake name.

c. K.H.'s trafficker would book two rooms at a time, one room for him and one for K.H.

d. There was heavy foot traffic in and out of K.H.'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

e. Other obvious signs of trafficking, consistent with the *modus operandi* of K.H.'s trafficker, which were observed by hotel staff.

78. Multiple employees at the Miller Rd RRI, including management-level employees, observed or otherwise learned of these obvious signs of K.H.'s trafficking while acting in the scope and course of their employment.

79. Hotel staff knew or were willfully blind to the fact that K.H. was being trafficked.

80. Each of the Miller Rd Defendants knew or should have known about K.H.'s trafficking because of policies and protocols that, on their face, required hotel staff to report suspected criminal activity, including trafficking activity.

81. Each of the Miller Rd Defendants also had constructive knowledge of the trafficking of K.H. at the Miller Rd RRI because that trafficking resulted from Defendants' facilitation of widespread trafficking at this hotel.

82. Despite having actual or constructive knowledge of the widespread and ongoing trafficking at the hotel, the Miller Rd Defendants kept renting rooms to traffickers, which were used to harbor and sexually exploit victims. In doing so, the

Miller Rd Defendants formed an implicit agreement and ongoing commercial relationship with traffickers at this hotel, including K.H.'s traffickers.

83.    The RRI Brand Defendants were directly involved in management and operation of the Miller Rd. RRI and directly participated in renting rooms to traffickers by providing boots on the ground at the Subject RRI.

84.    R-Roof VI and FMW RRI I participated in renting rooms to traffickers through ownership of the hotel property and through their collective venture and revenue sharing with the RRI Brand Defendants.

85.    The hotel staff at the Miller Rd RRI knew or were willfully blind to the fact that K.H. was being trafficked and, despite this, continued associating with her traffickers by providing them a venue to harbor and sexually exploit K.H. Defendants RRI Inc. and RRI West Inc. are responsible for the acts, omissions, and knowledge of all hotel staff at the Miller Rd RRI because:

   **a.** the hotel staff were acting in the scope and course of employment;

   **b.** RRI Inc. and RRI West Inc. ratified these acts and omissions; and

   **c.** RRI Inc. and RRI West Inc. failed to exercise reasonable care regarding the hiring, training, and supervision of the hotel staff, especially given the specific and known risks of human trafficking.

86.    Each of the Miller Rd Defendants was participating in operating the Miller Rd RRI in a way that the Defendant knew or should have known was creating

a favorable venue for sex trafficking at the hotel and attracting sex traffickers to the hotel.

87.   Each of the Miller Rd. Defendants benefited each time a hotel room was rented to a trafficker at the Miller Rd. RRI, including, but not limited to, through increased revenue:

   a. Before November 3, 2011, the RRI Brand Defendants and R-Roof VI directly generated revenue through room rentals at the Miller Rd RRI. Upon information and belief, revenue was collected from hotel guests and distributed among the RRI Brand Defendants and R-Roof VI pursuant to written agreements and other revenue sharing processes that were determined based on gross room revenue, such that the amount received by each of these Defendants increased each time a room was rented to a trafficker.

   b. After November 3, 2011, FMW RRI I directly generated revenue from hotel guests and distributed a portion of this revenue to the RRI Brand Defendants under franchising and management agreements. Fees paid to the RRI Brand Defendants under both the franchising and management agreements were based primarily on gross revenue from room rentals and thus payments to the RRI Brand Defendants increased with each room rental.

**B. The State St. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the State St. RRI, including K.H.'s trafficking, but continued providing a venue for trafficking.**

88.   The State St. Defendants were specifically aware that sex trafficking was widespread and ongoing at the State St. RRI.

89.     The area of Ann Arbor where the State St RRI is located has a known history of prostitution and sex trafficking.[31] There was a sex trafficking raid at the State St RRI at least as early as August 2011, which signals that the hotel is known to be a hotspot for sex trafficking.[32] News stories confirm that other women were being trafficked and abused at the State St. RRI in 2012.[33] An FBI-led bust at the State St RRI in May 2013 confirmed that the problem was ongoing, as it resulted in the arrest of a woman trafficking a 14-year-old girl.[34]

90.     Other victims were also being trafficked at the State St. RRI at and around the same time K.H. was trafficked there.

91.     Each of RRI Brand Defendants knew or should have known about the widespread and ongoing trafficking at the State St. RRI because of the methods, described above, that these Defendants used to monitor potential criminal activity at all RRI properties.

92.     The State St. Defendants knew or should have known the hotel was catering to traffickers and pimps. Upon information and belief, traffickers repeatedly and intentionally chose to use the State St. RRI for their sex trafficking activity because they knew that members of the staff looked the other way, because the

---

[31] https://www.mlive.com/news/ann-arbor/2015/05/woman_charged_for_running_ann.html
[32] https://www.mlive.com/news/ann-arbor/2015/05/woman_charged_for_running_ann.html
[33] https://www.freep.com/story/news/local/michigan/oakland/2022/03/09/human-trafficking-west-bloomfield-hannah/6976462001/
[34] https://annarborobserver.com/a-road-back-from-walking-the-streets/

policies and practices of the hotel facilitated their trafficking, and because of the access and security the hotel provided.

93. K.H.'s traffickers repeatedly interacted with the staff of the State St. RRI. The signs of this widespread sex trafficking were obvious, and the hotel staff knew about this activity or was willfully blind to it.

94. When K.H. was trafficked at the State St. RRI, there were obvious signs of her trafficking:

    a. The hotel rooms where she was trafficked were often paid for with prepaid cards.

    b. The hotel rooms where she was trafficked were often booked under a fake name.

    c. While K.H. was forced to have repeated visits from sex buyers, her trafficker stayed in the hallway and parking lot, visible and observed by hotel staff.

    d. There was heavy foot traffic in and out of K.H.'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

    e. Other obvious signs of trafficking, consistent with the *modus operandi* of K.H.'s trafficker, which were observed by hotel staff.

95. Multiple employees at the State St. RRI, including management-level employees, observed or otherwise learned of these obvious signs of K.H.'s trafficking, while acting within the scope and course of their employment.

96. Hotel staff knew or were willfully blind to the fact that K.H. was being trafficked.

97. Each of the State St Defendants knew or should have known about K.H.'s trafficking because of policies and protocols that, on their face, required hotel staff to report suspected criminal activity, including trafficking activity.

98. Each of the State St. Defendants also had constructive knowledge of the trafficking of K.H. because that trafficking resulted from Defendants' facilitation of widespread trafficking at this hotel.

99. Despite having actual or constructive knowledge of the widespread and ongoing trafficking at the hotel, the State St Defendants kept renting rooms to traffickers, which were used to harbor and sexually exploit victims. In doing so, the State St Defendants formed an implicit agreement and ongoing commercial relationship with traffickers at this hotel, including K.H.'s traffickers.

100. Ann Arbor Hospitality participated in renting rooms to traffickers through providing the "boots on the ground" at the State St. RRI.

101. As detailed below, RRI Brand Defendants participated in renting rooms to traffickers by (1) setting detailed policies and procedures controlling all details of the room rental process; (2) controlling the systems used for room booking and payment and all guest data related to those systems; and (3) participating directly in aspects of hotel operations related to sex trafficking.

102. The hotel staff at the State St RRI knew or were willfully blind to the fact that K.H. was being trafficked and, despite this, continued associating with her traffickers by providing them a venue to harbor and sexually exploit K.H. Defendant Ann Arbor Hospitality is responsible for the acts, omissions, and knowledge of all hotel staff at the State St RRI because:

    **a.** the hotel staff were acting in the scope and course of employment;

    **b.** Ann Arbor Hospitality ratified these acts and omissions; and

    **c.** Ann Arbor Hospitality failed to exercise reasonable care with regard to the hiring, training, and supervision of the hotel staff, especially given the specific and known risks of human trafficking.

103. Ann Arbor Hospitality was operating the State St. RRI in a way that it knew or should have known was creating a favorable venue for sex trafficking at the hotel and attracting sex traffickers to the hotel, including by renting rooms without requiring identification and allowing rooms to be rented under fake names, allowing rooms to be paid for with cash and prepaid gift cards, and implementing inadequate and unreasonable onsite security measures considering the significant known risk of criminal activity at the State St RRI.

104. Each of the State St. Defendants received increased revenue each time a room was rented to traffickers at the State St. RRI. Upon information and belief, Ann Arbor Hospitality received revenue directly from traffickers. The revenue was then passed through to the RRI Brand Defendants via required royalties and fees

under the franchising agreement. Fees that Ann Arbor Hospitality paid to the RRI Brand Defendants were primarily based on gross revenue from room rentals. Thus, payments to the RRI Brand Defendants increased with each room rental by traffickers.

**C. The Plymouth Rd Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Plymouth Rd RRI, including K.H.'s trafficking, but continued providing a venue for trafficking.**

105. The Plymouth Rd Defendants were specifically aware that sex trafficking was widespread and ongoing at the Plymouth Rd RRI.

106. Upon information and belief, the Plymouth Rd RRI was frequently used as a venue for sex trafficking because of ease of access for an established client base. Other victims were trafficked at the Plymouth Rd RRI at the same time as K.H., and at least one other victim has filed a lawsuit arising from her trafficking at this hotel during the 2012-2013 timeframe.[35]

107. Each of RRI Brand Defendants knew or should have known about the widespread and ongoing trafficking at the Plymouth Rd RRI because of the methods, described above, that these Defendants used to monitor potential criminal activity at all RRI properties.

---

[35] *K.O. v. G6 Hospitality, et al.*, 3:22-cv-11450-LJM-DRG (ECF No. 33).

108. The Plymouth Rd Defendants knew or should have known the hotel was catering to traffickers and pimps. Upon information and belief, traffickers repeatedly and intentionally chose to use the Plymouth Rd RRI for their sex trafficking activity because they knew that members of the staff looked the other way, because the policies and practices of the hotel facilitated their trafficking, and because of the access and security the hotel provided. These traffickers repeatedly interacted with the staff of the Plymouth Rd RRI. The signs of this widespread sex trafficking were obvious, and the hotel staff knew about this activity or was willfully blind to it.

109. When K.H. was trafficked at the Plymouth Rd RRI, there were obvious signs of her trafficking:

    a. The hotel rooms where she was trafficked were often paid for with prepaid cards.

    b. The hotel rooms where she was trafficked were often booked under a fake name.

    c. K.H.'s traffickers became friendly with the hotel staff to get better room placements.

    d. There was heavy foot traffic in and out of K.H.'s room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

    e. Other obvious signs of trafficking, consistent with the *modus operandi* of K.H.'s trafficker, which were observed by hotel staff.

110. Multiple employees at the Plymouth Rd RRI, including management-level employees, observed or otherwise learned of these obvious signs of trafficking at the Plymouth Rd RRI, including K.H.'s trafficking, while acting within the scope and course of their employment.

111. Hotel staff knew or were willfully blind to the fact that K.H. was being trafficked.

112. Each of the Plymouth Rd Defendants knew or should have known about K.H.'s trafficking because of policies and protocols that, on their face, required hotel staff to report suspected criminal activity, including trafficking activity.

113. Each of the Plymouth Rd Defendants also had constructive knowledge of the trafficking of K.H. because that trafficking resulted from Defendants' facilitation of widespread trafficking at this hotel.

114. Despite having actual or constructive knowledge of the widespread and ongoing trafficking at the hotel, the Plymouth Rd Defendants kept renting rooms to traffickers, which were used to harbor and sexually exploit victims. In doing so, the Plymouth Rd Defendants formed an implicit agreement and ongoing commercial relationship with traffickers at this hotel, including K.H.'s traffickers.

115. Given these obvious signs observed by hotel staff, each of the Plymouth Rd RRI Defendants knew or should have known about the trafficking of K.H. based

on policies and protocol that required hotel staff to report suspected criminal activity, including suspected trafficking.

116. RRI Inc. and RRI West Inc. were directly involved in management and operation of the Plymouth Rd. RRI and directly participated in renting rooms to traffickers by providing boots on the ground at the Subject RRI.

117. The hotel staff at the Plymouth Rd RRI knew or were willfully blind to the fact that K.H. was being trafficked and, despite this, continued associating with her traffickers by providing them a venue to harbor and sexually exploit K.H. The hotel staff also formed relationships with K.H.'s traffickers and accommodated their preferences for specific room locations. RRI Inc. and RRI West Inc. are responsible for the acts, omissions, and knowledge of all hotel staff at the Plymouth Rd RRI because:

    **a.** the hotel staff were acting in the scope and course of employment;

    **b.** RRI Inc. and RRI West Inc. ratified these acts and omissions; and

    **c.** RRI Inc. and RRI West Inc. failed to exercise reasonable care with regard to the hiring, training, and supervision of the hotel staff, especially given the specific and known risks of human trafficking.

118.   Each of the Plymouth Rd Defendant benefited every time a room was rented by a trafficker. Upon information and belief, revenue was collected from hotel guests and distributed among the Plymouth Rd Defendants under written agreements and other revenue sharing processes that were determined based on gross room revenue, such that the amount received by each of these Defendants increased each time a room was rented to a trafficker.

## V.   The RRI Brand Defendants facilitated sex trafficking at the Subject RRIs.

119.   The RRI Brand Defendants actively participated in facilitating activity that they knew or should have known was illegal sex trafficking at the Subject RRIs, including both the corporate locations and the franchised locations.

120.   Upon information and belief, the RRI Brand Defendants directly participated in renting rooms to traffickers at both its franchised and its company-operated properties in ways including but not limited to:

a.   They controlled all details of the guest reservation, check-in, and payment processes through management of and control over all systems used for those processes and through adoption and enforcement of detailed and specific policies dictating the means and methods used for the day-to-day implementation of these processes.

b.   They directly took reservations for rooms at the Subject RRIs and accepted payment for those rooms through a central reservation system that they controlled and operated.

c.   They could make reservations and take payment for rooms without any involvement or approval by the franchisee.

d. When a guest did not make a reservation in advance through the central reservation system, they still controlled the specific process used to register a walk-in guest and generate a reservation for that guest by requiring its franchisee to use a RRI system to process the room rental and payment.

e. They set or otherwise controlled room prices, required discounts, and reward programs.

f. They controlled all guest data related to room rentals,

g. They controlled and restricted the ability of hotel staff to refuse or cancel a reservation.

h. They established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the hotel until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i. They required franchisees to use a property management system, which was owned, maintained, and controlled by RRI Brand Defendants, for virtually all aspects of hotel operations related to room rentals. Through the backend of this system, they had direct involvement in room rentals.

j. They collected, tracked, and reported comprehensive information about each guest.

121. Through this involvement in the room rental process, the RRI Brand Defendants participated in a venture with the other Defendants and with the criminal traffickers by providing traffickers rooms even though the RRI Brand Defendants knew or should have known those rooms were being used for the sexual exploitation of victims, including K.H.

122. Upon information and belief, the RRI Brand Defendants also directly participated in aspects of hotel operations related to facilitation of sex trafficking, at both its franchised and its company-operated properties, in ways including but not limited to:

a. They retained control over and responsibility for training related to detecting and responding to human trafficking.

b. They retained control over and responsibility for setting, supervising, overseeing, and enforcing all policies and protocols regarding detecting and responding to human trafficking.

c. They were responsible for maintaining, monitoring, and analyzing patterns of criminal activity in franchised hotels.

d. They assumed responsibility for distributing safety-related information, including information related to trafficking, to franchisees and hotel staff.

e. They assumed responsibility for monitoring circumstances and events associated with a high risk of trafficking and notifying franchisees and hotel staff of the same; and

f. They retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the hotel, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

123. Through this direct involvement in aspects of hotel operations directly related to trafficking, the RRI Brand Defendants affirmatively facilitated trafficking. They made the Subject RRIs venues of choice for sex traffickers and established a continuous business relationship with trafficker in ways including but not limited to:

a. They adopted inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining franchisees and

front-line hotel staff regarding issues related to human trafficking.

b.  They implicitly condoned and endorsed repeated decisions by franchisees and hotel staff not to report or respond to trafficking appropriately.

c.  They encouraged hotel staff and franchisees to focus on revenue rather than preventing use of rooms for criminal activity, including trafficking;

d.  They continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking.

e.  They adopted policies and practices that allowed traffickers to reserve rooms using fake names and without providing valid identification matching the name on the room reservation.

f.  They adopted policies and practices allowed traffickers to reserve rooms using prepaid cards and cash, which provided relative anonymity and non-traceability.

g.  They adopted policies and practices that allowed access to high volumes of unregistered guests all going into the same room without logging these guests or requiring identification.

h.  They attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal.

i.  They reduced security costs by foregoing proper security measures.

j.  They continued to allow the Subject RRIs to use RRI trademarks despite actual or constructive knowledge of widespread and ongoing sex trafficking.

**VI.    The Defendants Benefited from Ventures Engaged in Violations of the TVPRA.**

124.    Through the actions described above, each Defendant participated in a venture that the Defendant knew or should have known had engaged in violations of the TVPRA.

125.    As detailed above, every Defendant participated in a venture by engaging in acts and omissions that supported, facilitated, harbored, and otherwise furthered the trafficker's sale and victimization of individuals, including K.H., for commercial sexual exploitation. The Defendants rented rooms to traffickers, permitted their illicit enterprise to operate on an ongoing and repetitious basis, and took no action to abide by the RRI Brand Defendants' own self-imposed anti-trafficking measures. Through these and other actions, Defendants participated in a venture that they knew or should have known was engaged in violations of the TVPRA.

126.    Had Defendants not harbored known and suspected human traffickers in exchange for financial gain, K.H.'s trafficker could not have successfully arranged for her to be continually sold for sex at Defendants' branded hotels.

127.    Had Defendants not had business models which permitted, facilitated, and encouraged ongoing human trafficking at their branded hotels, Plaintiff would not have been trafficked at Defendants' branded hotels.

128. If the Defendants had not facilitated activity that they knew or should have known was sex trafficking, then they would not have benefited from K.H.'s trafficking at the Subject RRIs.

129. Each of the Defendants received a direct increase in revenue because of the trafficking that they facilitated at the Subject RRIs, including K.H.'s trafficking specifically.

130. By participating in a venture that facilitated sex trafficking, each Defendant also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and the Subject RRIs specifically.

131. The motivation behind Defendants' ongoing willful blindness and ongoing failure to act is plain and simple – limitless corporate greed; Defendants ignored all of the signs of and solutions to human trafficking out of an unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

132. Each Defendant knowingly benefited from engaging in a venture with sex traffickers, including K.H.'s traffickers, at the hotel(s) that the Defendant owned, operated, managed, franchised, or controlled:

a. As detailed above, each Defendant received benefits, including increased revenue, every time a room was rented at the Subject RRIs.

b. This venture violated 18 U.S.C. §1591 through the actions of the criminal traffickers at the Subject RRIs, which each Defendant knew or should have known about.

c. Defendants associated with traffickers, including K.H.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. Defendants had a mutually beneficial relationship with the traffickers at the Subject RRIs, fueled by sexual exploitation of victims.

e. Sex traffickers, including K.H.'s traffickers, frequently used the Subject RRIs for their trafficking because of an implicit understanding that these hotels provided a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Defendants.

f. Each of the Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. K.H.'s trafficking at the Subject RRIs resulted from Defendants' participation in a venture with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from K.H.'s trafficking at the Subject RRIs.

133.   Through the conduct detailed above, each of the Defendants also knowingly benefited from engaging in a venture with other Defendants and with hotel staff as follows:

    a.   Defendants associated with one another and with the hotel staff to operate the Subject RRIs.

    b.   As detailed above, each Defendant received financial benefits from operating the Subject RRIs, including revenue generated specifically by renting rooms to traffickers. Defendants engaged in revenue sharing and had a common incentive to maximize revenue.

    c.   This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the Defendants' facilitation of widespread sex trafficking at the Subject RRIs.

    d.   Despite actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Each Defendant participated in the venture by continuing to associate with the hotel staff and with other Defendants to operate the Subject RRIs in a way that the Defendants knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like K.H.

    e.   K.H.'s trafficking at the Subject RRIs resulted from the hotel staff and Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Subject RRIs. Had Defendants not continued participating in a venture that they knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from K.H.'s trafficking at the Subject RRIs.

## VII.   Agency and vicarious liability

134.   The RRI Brand Defendants are vicariously liable for the acts, omissions, and knowledge of their franchisees, FMW RRI I and Ann Arbor

Hospitality, and of hotel staff operating the Subject RRIs, because the RRI Brand Defendants exercised systematic and pervasive control over the operation of the Subject RRIs.

135. RRI Brand Defendants subjected franchisees to detailed standards and requirements about the operation of the franchised hotels through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by RRI Brand Defendants. These written standards, protocols, and requirements:

    a. did not merely identify quality or outcome standards but specifically controlled the means, methods, and tools used to operate the Subject RRIs; and

    b. covered virtually all aspects of hotel operations, including internal operating functions; and

    c. dictated the specific manner in which franchisees and hotel staff must carry out most day-to-day functions at the Subject RRIs; and

    d. significantly exceeded what was necessary for the RRI Brand Defendants to protect their registered trademarks.

136. Along with the ways described throughout this Complaint, the RRI Brand Defendants, upon information and belief, both exercised and reserved the right to exercise systemic and pervasive control over day-to-day operation of its franchisees in many other ways, including:

    a. imposing robust reporting and recordkeeping requirements on all hotels, including franchised hotels;

b. requiring all hotels, including franchised hotels, to use a consolidated IT system and database for property management as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated;[36]

c. requiring franchisees to allow RRI Brand Defendants to install antivirus and web filtering software and to monitor and maintain computers at the front desk and in the back office;

d. controlling "a fully integrated database" which all hotels, including franchised hotels, must use to access customer data, reservations, and other information that is shared system-wide between the RRI Brand Defendants and their system hotels;[37]

e. fixing prices for all hotels, including franchised hotels;

f. mandating specific training for franchisees and hotel management at franchised hotels;

g. mandating on-site training for hotel staff at franchised hotels;

h. requiring online training for franchisees and staff of franchised hotels through the Red Roof Learning Management System;

i. requiring use of standardized training methods for employees of franchised hotels;

j. retaining sole discretion to determine whether training has been completed in a satisfactory manner;

k. requiring hotel management at franchised hotels to attend conferences and meetings;

l. adopting detailed job descriptions for employees to staff all hotels, including franchised hotels, and drafting policies and requirements that specifically dictate which staff members must perform day-to-day functions and how they must perform those functions;

m. controlling channels for guests to report complaints or provide feedback regarding franchised hotels and supervising and/or dictating the response to those complaints;

---

[36] See Red Roof Franchising, available at https://www.redrooffranchising.com/technology
[37] Technology, RED ROOF, https://www.redrooffranchising.com/technology

n. retaining the right to intervene directly to resolve a guest complaint about a franchised hotel and requiring the franchisee to reimburse the RRI Brand Defendants for any payment or other consideration paid to a complaining guest;

o. retaining the ability to require all franchised hotels to participate in centralized operational services;

p. controlling all aspects of facility and building design and maintenance at franchised hotels;

q. collecting, monitoring, and analyzing dozens of reports regarding franchised hotels through the backend of the property management system and using these reports to supervise and control the day-to-day operations;

r. exercising significant control over franchisees' procurement by designating what specific equipment and supplies franchisees must buy and designating approved vendors from which purchases can be made;

s. requiring franchised hotels to use approved vendors for internet services;

t. imposing other requirements for Wi-Fi access and filtering at franchised hotels;

u. imposing detailed insurance requirements for franchisees;

v. posting jobs for both corporate and franchised properties;[38]

w. providing benefits to employees of franchised properties;[39]

x. retaining nearly unlimited right to revise policies or adopt new requirements for day-to-day operations of franchised properties;

y. other actions that deprived franchisees of independent in the business operations in operating RRI hotels.

z. regularly inspected each of the Subject RRIs, including the franchised hotels.

---

[38] https://www.redroofjobs.com/
[39] https://www.redroofjobs.com/

137.   RRI Brand Defendants specifically retained control over the day-to-day operation of FMW RRI I and Ann Arbor Hospitality with regard to aspects of the operation of the Subject RRIs that caused K.H.'s harm, including but not limited to reservation policies and procedures, staff training, security policies and training, education, policies, and procedures on human trafficking.

138.   RRI Brand Defendants regularly advised FMW RRI I and Ann Arbor Hospitality on operational changes necessary to remain in compliance with RRI Brand Defendants' strict regulations.

139.   RRI Brand Defendants had the ability to impose fees or fines on FMW RRI I and Ann Arbor Hospitality. Furthermore, at all material times RRI Brand Defendants retained an absolute right to cancel its franchise agreements if its rules were violated or if FMW RRI I or Ann Arbor Hospitality otherwise breached its contractual obligations.

140.   RRI Brand Defendants exercised a degree of control beyond that necessary to protect their registered marks under the Lanham Act.

141.   Upon information and belief, each of the RRI Brand Defendants acted, individually and collectively with the other RRI Brand Defendants, to implement these mechanisms of control over RRI branded properties and RRI franchisees.

142.   At all relevant times, FMW RRI I and Ann Arbor Hospitality acted as the agent of the RRI Brand Defendants when operating the Subject RRIs.

143. Upon information and belief, Ann Arbor Hospitality and the RRI Brand Defendants shared control of the terms and conditions of the employment of the staff at the State St RRI and thus Ann Arbor Hospitality and the RRI Brand Defendants are joint employers. Upon information and belief, the RRI Brand Defendants exercised control over the terms and conditions of employment of staff at the State St. RRI.

## VIII. Defendants are Jointly and Severally Liable for K. H.'s Damages

144. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe.

145. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

### CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

146. K.H. incorporates all previous allegations.

147. K.H. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and 18 U.S.C §1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

148. Each of Defendants is a perpetrator within the meaning of 18 U.S.C §1595(a) because each of the Defendants:

    a. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored

individuals (including K.H.) in its hotel properties knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received a financial benefit by knowingly assisting, supporting, or facilitating a venture engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel property.

149. K.H. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and 18 U.S.C §1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

150. Through acts and omissions described throughout this Complaint, each of the Defendants received a financial benefit from participating in a venture with traffickers, including K.H.'s traffickers, even though each Defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, each of the Defendants is liable as a beneficiary under 18 U.S.C §1595(a).

151. Through the acts and omissions described throughout this Complaint, each of the Defendants also received a financial benefit from participating in a venture with the hotel staff and the other Defendants regarding the operation of the

Subject RRIs even though each Defendant knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

152. Violations of 18 U.S.C §§ 1591(a) and 1595(a) by each of the Defendants operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause K.H. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

153. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

154. The RRI Brand Defendants are vicariously liable for the TVPRA violations of Ann Arbor Hospitality and FMW RRI I, who were actual agents of the RRI Brand Defendants. In ways more fully described throughout this Complaint, the RRI Brand Defendants exercised control over the mode and manner of work and the day-to-day operations of Ann Arbor Hospitality and FMW RRI I. Factors that support this allegation are that the RRI Brand Defendants shared profits, standardized employee training, standardized and strict rules of operations, controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, the RRI Brand Defendants. had the right to terminate any franchisee, including Franchisee

Defendants, that violated the requirements promulgated by the RRI Brand Defendants.

155.   The RRI Brand Defendants are vicariously liable for the acts and omissions of the staff of each of the Subject RRIs because they jointly control the terms and conditions of their employment.

## DAMAGES

156.   Defendants' acts and omissions, individually and collectively, caused K.H. to sustain legal damages.

157.   Defendants are joint and severally liable for all past and future damages suffered by K.H.

158.   K.H. is entitled to be compensated for damages, including:

    **a.** Actual damages (until trial and in the future)

    **b.** Direct damages (until trial and in the future)

    **c.** Incidental and consequential damages (until trial and in the future)

    **d.** Mental anguish and emotional distress damages (until trial and in the future)

    **e.** Lost earnings and lost earning capacity (until trial and in the future)

    **f.** Necessary medical expenses (until trial and in the future)

    **g.** Life care expenses (until trial and in the future)

    **h.** Physical pain and suffering (until trial and in the future)

**i.** Physical impairment (until trial and in the future)

**j.** Unjust enrichment (until trial and in the future)

**k.** Exemplary/Punitive damages.

**l.** Attorneys' fees

**m.** Costs of this action

**n.** Pre-judgment and all other interest recoverable

159. A constructive trust should be imposed on Defendants and the Court should sequester any benefits or money wrongfully received by Defendants for the benefit of K.H.

## CONTINUING TORT DOCTRINE

160. To the extent Defendants assert an affirmative defense of limitations, K.H. invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

161. K.H. was subject to continuous trafficking at RRI hotels through October 2013, which is fewer than 10 years before K.H. filed this lawsuit.

162. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Subject RRIs and Defendants' ongoing venture with one another and with criminal traffickers.

163. K.H.'s cause of action did not accrue until the end of this continuous trafficking period, which was no earlier than October 2013.

164. K.H. filed this lawsuit fewer than 10 years after the last tortious act that was part of this continuous course of wrongful conduct.

## DISCOVERY RULE

165. To the extent Defendants assert an affirmative defense of limitations, K.H. invokes the discovery rule.

166. At the time she was harmed and through at least October 2013, K.H. was under coercion and control of traffickers who abused her, manipulated her, and kept her dependent on illegal drugs. At this time, K.H. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit.

167. While she was under the control of her trafficker, K.H.—through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was due to no fault on the part of K.H. but rather was a direct result of K.H. being kept under the control of her traffickers, which Defendants facilitated.

168. At the time of her harm, K.H. did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendant(s) hotels, or that she was a person trafficked, much less that she was being victimized by a human trafficking venture. K.H. did not know what "human trafficking" was, much less that she was being victimized by a human trafficking venture, and she did not

discover and could not discover the existence of a cause of action until shortly before suit was filed, and certainly not more than ten years before suit was filed.

## JURY DEMAND

169.   K. H. requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, K. H. prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for K.H.  against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which K.H. may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,


/s/ B.A. Tyler
B. A. Tyler (P25404)
Attorney for Plaintiff
Tyler Law Firm PLLC
3001 West Big Beaver Rd.,
Ste. 110
Troy, MI 48084
(248) 458-6600
btyler@tyler-legal.com

/s/ Michael Hamilton
Michael Hamilton
Attorney for Plaintiff
TN Bar No. 010720
4205 Hillsboro Pike, #303
Nashville, TN 37215
615-297-1932
mhamilton@pulf.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2023, my assistant Ashley Warbington, electronically filed the foregoing document with the Clerk of the Court using the MiFile System which will send notification of such filing to counsel of record.

/s/ Michael Hamilton
Michael Hamilton

| | |
|---|---|
| Timothy Jordan | B.A. Tyler |
| Garan Lucow Miller P.C. | Tyler Law Firm PLLC |
| 1155 Brewery Park Blvd., Ste. 200 | 3001 West Big Beaver Rd., Ste. 110 |
| Detroit, MI 48207 | Troy, MI 48084 |
| (313) 446-5531 | (248) 458-6600 |
| tjordan@garanlucow.com | btyler@tyler-legal.com |

Alexander W. Heritier
Garan Lucow Miller P.C.
201 South Main Street, 5th Floor
Ann Arbor, MI 48104
(734) 663-7717
ahertitier@garanlucow.com

Attorney for Plaintiff

Cicely I. Lubben #53897
Tucker Ellis LLP
100 South 4th St, Ste 600
St. Louis, MO 63102

(314) 256-2550
asbgroup@tuckerellis.com

Chelsea Mikula
Tucker Ellis LLP
950 Main Avenue, Ste 1100
Cleveland, OH 44113
(216) 696-2476
Chelsea.mikula@tukerellis.com

Attorneys for Red Roof Inns, Inc.